### Charles F. Ross, Appellant, v. New South Farm & Home Company, Appellee.

#### Gen. No. 19,304.

1. APPEAL AND ERROR, § 1078*—*necessity of cross-error to appellee's right to review.* Where appellant has assigned all errors necessary to the review of all findings and rulings adverse to him and no cross-errors have been assigned, the findings of fact must, as against appellee be considered to be supported by the evidence.

2. CORPORATIONS, § 748*—*when want of license not a defense.* In an action to recover a commission for securing a loan, the fact that defendant is a foreign corporation and has not complied with Hurd's R. S., ch. 32, sec. 67c (J. & A. ¶ 2527) does not constitute a defense, since it is not primarily unlawful to contract for a commission to secure a loan.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Vol. CLXXXXI 23

3. CORPORATIONS, § 748*—*enforceability of unlawful contract against foreign corporation.* While contracts made in violation of Hurd's R. S., ch. 32, sec. 67c (J. & A. ¶ 2527) are not enforceable at the instance of the corporation, they are enforceable against the corporation unless they are unlawful in themselves.

4. BROKERS, § 4*—*construction of requirement of license as to isolated acts.* An ordinance making it unlawful for one to engage in the business or act in the capacity of a broker, within the city, without first obtaining a license, applies only to persons engaged in the business of brokerage as an occupation or vocation and not to those who have participated in isolated acts.

5. BROKERS, § 28*—*what constitutes an unlicensed broker.* In an action to recover a commission for securing a loan, *held* as an ultimate fact that plaintiff was not at the time of the transaction involved a broker or acting in the capacity of a broker within the meaning of sections 192 to 198 of chapter XV of the Ordinances of the City of Chicago, making it unlawful for one to engage in the business or act in the capacity of a broker, within the city, without first obtaining a license.

Appeal from the Municipal Court of Chicago; the Hon. HARRY C. MORAN, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1913. Reversed with finding of fact and judgment here. Opinion filed February 3, 1915.

MILLER, STARR, PACKARD & PECKHAM, for appellant; CHARLES L. COBB, of counsel.

W. A. BOWLES and FOREMAN, LEVIN & ROBERTSON, for appellee.

MR. JUSTICE GRAVES delivered the opinion of the court.

Appellee is a Florida corporation owned chiefly, if not exclusively, and officered by three gentlemen respectively named Sieg, Leven and Strauss. This corporation dealt in Florida lands extensively, had large assets, substantial liabilities, and was in need of money. On February 7, 1911, Leven, on behalf of the corporation, told its needs to one Clyde A. Mann, and told him if he would put the corporation in touch with some one

from whom it could borrow $50,000 or $100,000, it would give to Mann ten per cent. on the amount borrowed as his commissions. Mann told Leven he thought the loan could be secured and asked him to put his offer in writing which was done. This written proposal was assigned by Mann to C. F. Ross. A loan of $100,000 from the Assets Realization Company, sometimes called "Cobe and McKinnon" was soon negotiated. Thereafter, but before the money was paid over, Ross asked Sieg and Strauss for a written confirmation to him of the agreement made between Leven and Mann, which had been so assigned to him. In response to that request the following writing was executed by appellee and delivered to Ross:

"NEW SOUTH FARM AND HOME COMPANY
Merchants Loan & Trust Building,
Chicago,
March 1, 1911.

Mr. Chas. F. Ross,
339-341 Rand McNally Bldg.,
Chicago, Ills.

Dear Sir:
We hereby confirm the arrangement made by Mr. Ben Leven of date February 7th, 1911, whereby we are to pay you 10% commission on all moneys received by us from Cobe and McKinnon or from others which you are instrumental in getting for us. Said commission is to be paid in cash when any deal is consummated.

Yours truly,
NEW SOUTH FARM & HOME COMPANY,
CHAS. H. SIEG,
President."

Soon thereafter the Assets Realization Company began to pay over to appellee the funds negotiated for, and appellee began paying to appellant instalments on his commissions. In that way appellant received from appellee $1,000 on March 10, 1911, $1,000 on March 13, 1911, and $1,000 on March 15, 1911. Further payments were refused by appellee and this suit was brought to

recover $7,000, as the unpaid balance of commissions due Ross for being instrumental in getting the loan. The court before whom the case was tried without a jury held the following facts, among others, to be established by the evidence: That the contract between the parties for procuring a loan was repeatedly ratified and acknowledged by appellee; that appellee continued throughout the transaction to request and encourage appellant to continue his efforts to procure the loan with full knowledge of his claim for commissions, and that it was estopped to deny the contract; that appellant was instrumental and the procuring cause in securing the loan of $100,000 for appellee; that appellant did not procure the contract by fraud, circumvention or false representations; that in rendering the services he did render in securing this loan appellant was engaged in the business and was acting in the capacity of a broker in the city of Chicago, and had not complied with the ordinances of the city regulating brokers; that appellee is a foreign corporation not duly licensed to do business in this State and not entitled to do business here without a license; that the business here involved was transacted in the city of Chicago and in the State of Illinois.

The court then found the issues for the defendant (appellee here) and rendered judgment against the plaintiff (appellant here) for costs.

Appellant had assigned all errors necessary to the review of all findings and rulings adverse to him. No cross-errors have been assigned. The findings of fact must, therefore, as against appellee, be considered to be supported by the evidence.

During the trial a motion of appellant to strike from the files that paragraph of appellee's affidavit of defense which set up the defense that it was a foreign corporation not licensed to do business in this State was reserved to the end of the case and was then allowed. No cross-error has been assigned by appellee to that action of the court and the correctness of that

ruling is, therefore, not here for review. However, as counsel on both sides have argued at length the question whether a foreign corporation of a character requiring a license in this State before it is authorized to do business here, and not so licensed, can avail itself of that fact to defeat its own contract, we have given it consideration.

Section 67c, ch. 32, Hurd's R. S. (J. & A. ¶ 2527), which prohibits foreign corporations of certain kinds from doing business in this State without being first licensed by the Secretary of State, was enacted for the protection of persons dealing with such corporation and not for the protection of the corporation against those with whom it deals. No foreign corporation is bound to comply with that statute. It may refrain from so doing and be safe, provided it at the same time refrains from transacting business and exercising its corporate powers here. If it undertakes to transact business or exercise its corporate powers in this State without complying with this statute, it does so at its own risk. It is presumed to know the law, and it necessarily knows the fact whether it has complied with the law or not, for to comply with the law requires affirmative action on the part of its officers. Those with whom it deals, while also presumed to know the law, may not and usually do not know and are not able to find out whether it has complied with the law without very considerable trouble and delay and some expense. To exact the same penalty from one who acts in ignorance of whether those with whom he is doing business have complied with the law, and are, therefore, entitled to transact the business in hand and who relies and has the right to rely on the presumption that every man will comply with the requirements of law and act honestly, as is exacted from him who knowingly acts in violation of law, would manifestly not be dealing out even-handed justice, even in cases where the transaction entered into is unlawful in itself. We think

no respectable authority can be found which, when rightly understood, can be construed to announce the law to be that in cases where the transaction is not in itself unlawful, the party who knowingly acts in violation of law can use such acts as a shield or defense when called upon by the innocent to perform its part of the transaction so entered into. Contracts made in violation of the section of the statute above referred to are not enforceable at the instance of the corporation, but unless they are unlawful in themselves they are enforceable against the corporation. It was not primarily unlawful for appellee to contract for a loan or to contract with appellant to aid them in securing a loan and to pay him a commission for so doing. The fact that appellee was a foreign corporation and had not complied with the provisions of section 67c of chapter 32, Hurd's Revised Statutes, constitutes no defense to appellant's claim in this case. *Watertown Fire Ins. Co. v. Rust,* 141 Ill. 85, adopting the opinion in the same case found in 40 Ill. App. 119; *Rockhold v. Canton Masonic Mut. Benevolent Society,* 129 Ill. 440; *McCartney v. Supreme Tent,* 132 Ill. App. 15; Thompson on Corporations, vol. 5, sec. 6711.

What we regard as the controlling question presented by this appeal is whether appellant, while performing the services in which he claims to have earned the commissions sued for, came within the provisions of section 192 to 196 inclusive of chapter XV of the Ordinances of the City of Chicago. Section 192 provides that: "It shall be unlawful for any person or corporation to engage in the business or act in the capacity of a broker, within the City, without first obtaining a license therefor." Section 194 defines a broker as "one who is engaged for others in negotiating contracts relative to property with the custody of which he has no concern." Section 195 defines a real estate broker to be "one who is engaged for others in negotiating contracts relative to real estate."

In the case of *O'Neill v. Sinclair,* 153 Ill. 525, an ordinance, in substance the same as the one now in force, with the words "or in the capacity of" omitted, was construed.  That court held that the negotiation of a single sale by a person who was not in the business of selling or negotiating sales of real estate did not constitute him a real estate broker within the meaning of the ordinance; that the term "real estate broker" applied solely to persons making sales or negotiation of sales of real estate as a business or occupation.  The *O'Neill* case, *supra,* has been cited with approval in *Weinshenker v. Epstein,* 176 Ill. App. 104; *Jones v. Missouri Lumber & Mining Co.,* 166 Ill. App. 266; *Packer v. Sheppard,* 127 Ill. App. 598; *Lake v. Koutsogianis,* 174 Ill. App. 252, and in each of those cases, except the *Weinshenker* case, *supra,* as well as in *Crilly v. Young,* 152 Ill. App. 72, the plaintiff who was suing for commissions in a single transaction without having taken out a license as a broker was allowed to recover his commissions on the theory announced in the *O'Neill* case, *supra,* the evidence being held not to show that the party was engaged as a business in selling property for others or negotiating contracts relative thereto.

We are not prepared to hold, as was apparently done in the *Crilly* case, *supra,* that it necessarily requires more than one act of brokerage to bring one under the provisions of the ordinance in question.  If one should rent and furnish an office and place on the doors and windows thereof signs announcing that he is in the brokerage business, spend his time in listing property for sale and customers for property, solicit business in his line and undertake to negotiate for others contracts relative to real estate, he would, we think, be a broker and be amenable to the ordinance referred to, even before, and certainly when, he had consummated the first deal.  There is no mystery about this ordinance.  It is plainly intended to reach those who are

in the business of brokerage and no one else. Appellee insists that the words "or act in the capacity of a broker," added by an amendment to the ordinance, were so added for the purpose of prohibiting and do prohibit single acts, such as, if repeated, would constitute a brokerage business. Whatever reason there might be in that contention, if it were now a question for original construction, we do not consider it now to be an open question. In all the cases above cited, we think, with the exception of the *O'Neill* case, *supra,* the words "or act in the capacity of a broker" were included in the ordinances at the time the cases arose, yet the court either ignored the added words or treated them as surplusage and construed the ordinance to mean the same as it was construed in the *O'Neill* case. In all those cases, except the *Weinshenker* case, the plaintiff, who was not a licensed broker, and who was suing to recover for commissions earned in a single transaction, was allowed to recover. In *Banta v. City of Chicago,* 172 Ill. 204, this ordinance, containing the words in question, was construed to be "an ordinance declaring it unlawful for any person, association or corporation *to engage in business* in *the capacity* of a broker" and that it "levies a license fee upon each person *pursuing the occupation* of a broker," and was held valid, because the city has "ample power and authority to impose license fees upon the *occupation* of a broker  *  *  *." All through that opinion the ordinance is treated as applying to persons engaged in the occupation or pursuing the vocation of a broker. No expression is there found that suggests even the possibility that the words referred to could be intended to apply to isolated acts of persons not so engaged. In view of the long and unbroken line of cases in which the rights of litigants have been determined by the courts of this State upon the theory that this ordinance as at present worded applies only to persons engaged in the business of brokerage as an occupation or voca-

tion and not to those who have participated in isolated acts, it would be the height of presumption for this court now to give to it a contrary meaning.

On the question of whether appellant at the time he rendered the services for which he claims commissions was engaged in the city of Chicago in the business of a broker as an occupation or vocation, there is no conflict in the evidence. It all comes either from the mouth or pen of appellant or from those who have testified of his acts. On the witness stand appellant told, apparently without reserve, of the various places where he had been employed or in business from his first start in a business life in Toronto, Canada, to the day of the trial, and what he did in those various places, although it is inconceivable how what he did, or where he was engaged in business at times and places both before and after the transaction here involved and at remote distances from the city of Chicago, can be of much aid in determining whether he was engaged in brokerage as a business, calling or vocation at the time in question. The list of the businesses in which he has been engaged includes banking in Toronto, Canada, from 1882 to 1896; brokerage at the same place about two years after he quit the banking business there; manager of trading stamp companies in Massachusetts and Connecticut; selling paving blocks in New York on commission; general agent on salary for Pacific Coast Borax Company at Boston, Mass., and Buffalo and Rochester, New York, up to about the time he came to Chicago, which was in June, 1909; an accountant, auditing the books of the Chicago Athletic Club; selling stock and promoting for the Consolidated Casualty Company up to March, 1910; "got out pamphlets and things like that" at Newton, Iowa, in connection with an issue of preferred stock in a corporation there; worked a "couple of months" in Southern Illinois for C. S. Kidder of Chicago, who was in the bond business; audited the books of the Lamont City Bank; went to

Indiana and tested out a railroad safety device; and sold life insurance for Union Central Life Insurance Company. That was in January, 1911. It was while he was so last engaged that the contract between Leven and Mann on which this suit is based was turned over to him. On March 1, 1911, he introduced a Mr. Baldwin, connected with and who wanted a loan for the San Jose Lumber Company, to Mr. Ridgely of the Assets Realization Company. Between February 8th and March 10th he secured some money for Leven or the appellee from some person other than the Assets Company. This was the last transaction appellant was engaged in up to the time this suit was commenced. During his examination as a witness he was asked: "You found that the supposition prevalent, that you had procured this loan from the Assets Realization Company for the New South Farm & Home Company helped you in your business, did it not?" To this he answered, "No, I didn't have any business as a matter of fact."

A careful consideration of appellant's testimony must, it seems to us, convince any impartial mind that in truth he did not have any definite business which it can be said he was following as an occupation or employment, and that his last answer above quoted was literally correct. It further shows that he was a man who held himself ready and willing to pursue any line of endeavor where his personal efforts and ingenuity would be likely to be remunerated.

If his testimony is true, and it is uncontradicted and sounds reasonable, if he could be said to have any business at the time he undertook to render and when he rendered the services sued for, it was that of a life insurance agent, or, as it is sometimes called, selling life insurance. If it be a fact that his success in this transaction stimulated in him a determination to enter the business of a broker, and if in fact he did thereafter engage in that business, such facts could not be con-

sidered as relating back to and characterizing this transaction, the opportunity for which came about unsought. We think that the finding of the trial court that at the time of this transaction appellant was engaged in the business of a broker and that he was acting in the capacity of a broker is clearly in conflict with the evidence.

The contract sued on and its performance by appellant being established, judgment should have been entered in the Municipal Court for the $10,000 agreed commission, less $3,000 paid before suit was brought, together with interest on the unpaid balance of $7,000 at five per cent. per annum from March 17, 1911, the date the contract was repudiated to the date of the judgment.

The judgment of the Municipal Court is, therefore, reversed with a finding of fact to be incorporated in the record of this court, and judgment here entered in favor of appellant and against appellee for $8,357.21, which includes $7,000, the unpaid part of the agreed commission stipulated for, and $1,357.21, interest on $7,000 at the rate of five per cent. per annum from March 17, 1911, when this debt was repudiated, to this date, and for costs in both courts.

*Judgment reversed with finding of fact and judgment here.*

Finding of fact.—We find as an ultimate fact that appellant was not at the time of the transaction here involved a broker or acting in the capacity of a broker within the meaning of sections 192 to 198 of Chapter XV of the Ordinances of the City of Chicago.